# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

ANTHONY COWARD, and
WENDY COWARD,

Plaintiffs,

  v.

FORESTAR REALTY, INC.,
NEW TOWNE PROPERTIES,
LLC, TEMCO ASSOCIATES,
LLC, and JOHN DOES 1
THROUGH 15,

Defendants.

CIVIL ACTION NO.

4:15-CV-0245-HLM

## ORDER

This case is before the Court on Defendants Forestar

Realty, Inc. and Temco Associates, LLC's Motion to Dismiss

[16].

## I.     Standard Governing a 12(b)(1) Motion to Dismiss

Defendant Forestar Realty, Inc. ("Defendant Forestar") and Defendant Temco Associates, LLC ("Defendant Temco") move to dismiss Counts I and II of Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). (Mot. Dismiss (Docket Entry No. 16) at 1.)

A court should dismiss a complaint for lack of jurisdiction under Rule 12(b)(1) only where it lacks jurisdiction over the subject matter of the dispute. Fed. R. Civ. P. 12(b)(1). "Attacks on subject matter jurisdiction come in two forms: 'facial attacks' and 'factual attacks.'" AFC Enters., Inc. v. Restaurant Group, LLC, Civil Action File No. 1:10-CV-01772-TWT, 2010 WL 4537812, at *2 (N.D. Ga. Nov. 3, 2010). "Facial attacks 'require[] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his

2

complaint are taken as true for the purposes of the motion.'" Id. (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)).  A plaintiff opposing a facial attack consequently "is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion." Id.

A factual attack, in contrast, challenges "'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" AFC Enters., Inc., 2010 WL 4537812, at *2 (quoting Lawrence, 919 F.2d at 1529) (internal quotation marks omitted).  In a factual attack, "[t]he presumption of truthfulness does not attach to the plaintiff's allegations." Id.  Additionally, "'the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" Id.

3

(quoting Scarfo v. Ginsberg, 175 F.3d 957, 960-61 (11th Cir. 1999)).

## II. Background

### A. Plaintiffs' Allegations

#### 1. The Parties

Plaintiffs, husband and wife, own property and reside at 186 Lullwater Late, Dallas, Paulding County, Georgia. (Compl. (Docket Entry No. 1) ¶ 9.) Plaintiffs bring this action under the citizen suit provision of the Clean Water Act. (Id.) Defendant Forestar is a foreign corporation doing business in Paulding County, Georgia. (Id. ¶ 10.) Defendant Forestar owns or operates the Seven Hills residential subdivision located at Seven Hills Boulevard and Lullwater Lane. (Id.) Defendant New Towne Properties, LLC ("Defendant New Towne") is a Georgia limited liability company and is, or was, an owner or operator of property located within Seven Hills.

4

(<u>Id.</u> ¶ 11.)  Defendant Temco is also a Georgia limited liability company with its principal office in Austin, Texas that is, or was, an owner or operator of Seven Hills.  (<u>Id.</u> ¶ 12.) Defendants John Does are developers, contractors, subcontractors, and other persons and entities, who are liable for the conduct described in the Complaint.  (<u>Id.</u> ¶ 13.)

### 2.    Plaintiffs' Purchase of the Property

On or about February 5, 2007, Plaintiffs entered into a New Construction Purchase and Sale Agreement to construct their home within Unit D of Seven Hills on Lot 13. (Compl. ¶ 14.)  Lot 13 was a wooded lot located on a cul-de-sac with a large creek behind it.  (<u>Id.</u>)  Plaintiffs moved into their home at 186 Lullwater Lane on or about September 19, 2007. (<u>Id.</u> ¶ 15.)

### 3. History of Plaintiffs' Issues

In August of 2011, Plaintiffs contacted their homeowners' association and Paulding County to file a complaint when the silt fence separating their property from the retention pond on the adjacent Lot 12 fell down. (Compl. ¶ 16.) Plaintiffs observed storm water and mud flowing across their property and into Little Pumpkinvine Creek from the adjacent lot, which killed the sod in their yard. (Id. ¶ 17.) In the early portion of 2014, construction began on Lot 12. (Id. ¶ 18.) On or about March 24, 2014, Plaintiffs notified Paulding County that storm water and eroded soils washed across their property and into the creek after it rained. (Id.)

According to Plaintiffs, before the beginning of construction on Lots 9, 10, 11, and 12, their property did not experience flooding with excessive amounts of storm water and eroded soils, sediment, rock, sand, debris, and other

6

materials when it rained. (Compl. ¶ 20.) Plaintiffs claim that, since construction on those lots began, discharges of eroded soils, sediment-laden storm water, rock, sand, dirt, debris, and other materials onto Plaintiffs' property and into the creek have increased substantially when it rains. (Id. ¶ 21.) Plaintiffs state that these discharges have flowed and continue to flow onto Plaintiffs' property and into Little Pumpkinvine Creek as well as adjacent wetlands. (Id. ¶ 24.) Plaintiffs allege that Defendants' construction activities at Seven Hills were conducted without proper design, installation, and maintenance of appropriate erosion and sediment control measures in accordance with Best Management Practices ("BMPs") as required by the CLearn Water Act, the Georgia Water Quality Control Act, and the Georgia Erosion and Sedimentation Act of 1975. (Id. ¶ 22.)

### 4.   Subsequent, Specific Events

On or about December 23, 2014, Plaintiffs'' garage flooded and the driveway was washed out during a rain event. (Compl. ¶ 26.)  Plaintiffs reported the event to their homeowners association and indicated that the grading for Lots 9 and 10 had caused additional sediment-laden storm water and mud to flow across the cul-de-sac and onto Plaintiffs' property.  (Id.)

On or about June 4, 2015, sediment-laden storm water and mud flowed from Lots 9 and 10 across the cul-de-sac, onto Plaintiffs' property, and into Little Pumpkinvine Creek, during a rainstorm.  (Compl. ¶ 27.)  Plaintiffs photographed the event and claim that BMPs put in place by Defendants failed on that day. (Id.; Compl. Ex. C (Docket Entry No. 1-4).)  Plaintiffs also claim that "excessive amounts of sediment-laden storm water and mud flowed from Lots 9, 10 and 11

8

across the cul-de-sac onto [Plaintiffs'] property and into Little Pumpkinvine Creek during a rain event" on June 4, 2015, June 9, 2015, June 11, 2015, June 24, 2015, June 27, 2015, July 1, 2015, July 6, 2015, August 5, 2015, August 8, 2015, August 17, 2015, August 18, 2015, August 19, 2015, August 20, 2015, August 23, 2015, September 3, 2015, November 18, 2015, December 1, 2015, and December 2, 2015. (Compl. ¶¶ 27-39.) On several of those days, Plaintiffs took photographs of what occurred. (Compl. Ex. C, D, F, H-K (Docket Entry Nos. 1-4, 1-5, 1-6, and 1-8 through 1-11).) On several days, Plaintiffs recorded videos of what happened. (Compl. Ex. E (Docket Entry No. 5).) On June 24, 2015, in particular, Plaintiffs allege that sediment accumulated on their driveway. (Compl. ¶ 29; Compl. Ex. G (Docket Entry No. 1-7).) Plaintiffs state that on September 3, 2015 Defendants installed a drain in the cul-de-sac immediately

9

upstream of Plaintiffs' driveway and during installation of the drain, excessive amounts of sediment-laden storm water and mud flowed across the cul-de-sac and onto Plaintiffs' property and into the creek. (Compl. ¶ 35.) According to Plaintiffs, water and mud that enters the drain discharges onto their property and into the creek. (Id.; Compl. Ex. E and J.)

Plaintiffs allege that storm water and other pollutants continue to be discharged onto their property and into Little Pumpkinvine Creek and adjacent wetlands during rain events. (Compl. ¶ 41.)

### 5. Permits and Government Actions

Plaintiffs make the following allegations with respect to the Clean Water Act, 33 U.S.C. § 1251 et seq (the "CWA"). According to Plaintiffs, the CWA requires permits under the National Pollutant Discharge Elimination System ("NPDES")

for all point source discharges of pollutants into waters of the United States. (Compl. ¶ 42.) Plaintiffs state that, in Georgia, discharges associated with construction activities are covered under the State of Georgia's NPDES General Storm Water Permit (the "General Permit"). (Id. ¶ 44.) Under the General Permit, storm water discharges may not violate Georgia water quality standards set forth in Georgia Rules and Regulations § 391-3-6-.03. (Id. ¶ 45.) Plaintiffs state that the General Permit has a variety of requirements including the maintaining of appropriate BMPs, adherence to engineering principles, protection of adjoining properties, providing a non-erosive water flow to maintain natural physical and biological charger of watercourses, and having an Erosion Sedimentation and Pollution Control Plan. (Id. ¶¶ 46-52.)

Plaintiffs allege that on September 26, 2008, Defendant Temco, along with Cousins Real Estate Corp., as Managing Member, and Craig A. Lacey, as Vice President, filed a Notice of Intent ("NOI") for coverage under the General Permit for Seven Hills Unit D.  (Compl. ¶ 53; Compl. Ex. A (Docket Entry No. 1-2) Ex. A.)  The NOI was a Re-Issuance Notification for an existing construction site and indicated that construction began on the site on April 15, 2005. (Compl. ¶ 54; Ex. A. to Compl. Ex. A.)  On May 12, 2005, Defendant Tecmo submitted site development plan for Seven Hills Unit D to Paulding County, and Defendant Tecmo has not filed a notice of termination to terminate coverage under the General Permit for construction at Seven Hills Unit D.  (Compl. ¶ 55.)

Plaintiffs state that on June 2, 2014, Defendant Forestar filed a NOI under the General Permit to discharge storm

water from land-disturbing activities at Seven Hills Unit D as the Primary Permittee.  (Compl. ¶ 56; Ex. B to Compl. Ex. A.) Defendant Forestar also submitted a site development plan dated April 27, 2005 to Paulding County for Seven Hills Unit D.   (Compl. ¶ 57.)   Plaintiffs allege that Defendant New Towne filed several NOIs as a Secondary Permittee for several lots in the Lullwater Lane neighborhood including Lots 12, 20, 11, 22, and 25.  (Compl. ¶ 58; Ex. C to Compl. Ex. A.)

Plaintiffs claim that, on January 6, 2014, Paulding County Erosion and Sediment Control issued a Stop Work Order to Defendant New Towne for several deficiencies at 191 Lullwater Lane--Lot 12--, including "failure to follow plan" and "pumping mud/silt into creek."  (Compl. ¶ 59; Ex. D. to Compl. Ex. A.)   Plaintiffs state that, on May 29, 2015, Paulding County issued a Stop Work Order to Defendant

New Towne for erosion and sedimentation control deficiencies on Lots 25, 22, 20, 11, and 19.  (Compl. ¶ 59; Ex. E. to Compl. Ex. A.)[1]  Plaintiffs claim that Defendants failed to follow the Erosion, Sedimentation and Pollution Control Plan by not installing upstream drainage swale as shown in the original construction plans.  (Compl. ¶ 60; Ex. F to Compl. Ex. A.)[2]

### 6.   Plaintiffs' Claims

Plaintiffs allege the following claims against Defendants: (1) violation of the CWA (Compl. ¶¶ 75-84); (2) violation of the CWA by the filling of jurisdictional waters and wetlands (id. ¶¶ 85-91); (3) trespass (id. ¶¶ 92-94); (4) nuisance (id. ¶¶

---

[1] The Court notes that the documents attached as Exhibits D and E to Exhibit A to the Complaint are basically illegible.

[2] Exhibit F to Complaint Exhibit A states that, as of a site visit on July 7, 2015, "[a] large portion of the clearing that had been performed on lots 9 & 10 was to facilitate upstream drainage swale installation that had been called for in original construction plans."  (Ex. F to Compl. Ex. A.)

14

95-96); (5) punitive damages (<u>id.</u> ¶¶ 97-98); and (6) attorneys' fees (<u>id.</u> ¶¶ 99-100). Counts III, IV, V, and VI apparently arise under Georgia law.

## B. Procedural Background

Plaintiffs filed this case on December 18, 2015. (Docket Entry No. 1.) On February 16, 2016, Defendants Forestar and Temco filed their Motion to Dismiss. (Docket Entry No. 16.) The briefing process for that Motion is now complete, and the Court finds that the matter is ripe for resolution.

## III. Discussion

### A. Applicability of CWA § 404

Count II of the Complaint alleges that Defendants are violating the Clean Water Act "by discharging dredged and/or fill material without a permit issued under § 404." (Resp. Mot. to Dismiss (Docket Entry No. 17) at 11.) Defendants Forestar and Temco contend that the discharges of eroded

materials in this case are governed only under the NPDES permit program found in § 402 and do not require a § 404 permit.  (Br. Supp. Mot. to Dismiss (Docket Entry No. 16-1) at 8-10.)

CWA § 404, codified at 33 U.S.C. § 1344, requires a permit for "[a]ny discharge of dredged or fill material into…navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject."   33 U.S.C. § 1344(f)(2).   "Section 404(a) gives the [Army] Corps [of Engineers] power to 'issue permits ... for the discharge of dredged or fill material.'"  Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 275 (2009) (quoting 33 U.S.C. § 1344(a)).  Army Corp regulations define "dredged material" to mean "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c).  The

same regulations define "fill material" as "material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States." Id. § 323.2(e)(1). Examples of fill material include "rock, sand, soil, clay, plastics, construction debris, [and] wood chips." Id. § 323.2(e)(2). Additionally, the regulation states:

> The term discharge of fill material means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as

17

sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials; and artificial reefs. The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.

33 C.F.R. § 323.2(f).

"As the regulatory regime stands now, a discharger must ask a simple question—is the substance to be discharged fill material or not?  The fill regulation, 40 CFR § 232.2, offers a clear answer to that question; and…if the discharge is fill, the discharger must seek a § 404 permit from the Corps." Coeur Alaska, 557 U.S. at 276.  According to four Justices of the Supreme Court, "dredged or fill material" are "unlike traditional water pollutants" because they "are solids that do not readily wash downstream."

18

Rapanos v. United States, 547 U.S. 715, 723 (2006) (plurality opinion), see also id. at 744-45 ("In contrast to the pollutants normally covered by the permitting requirement of § 1342(a), 'dredged or fill material,' which is typically deposited for the sole purpose of staying put, does not normally wash downstream, and thus does not normally constitute an 'addition ... to navigable waters' when deposited in upstream isolated wetlands. The Act recognizes this distinction by providing a separate permitting program for such discharges in § 1344(a)." (alteration in original) (footnote and citations omitted)); but see id. at 775 (J. Kennedy concurring) (questioning the proposition that fill material does not normally wash downstream) and id. at 806-07 (J. Stevens dissenting) (suggesting that while most fill materials will probably stay put, at least some fill material makes its way downstream). The United States Court of

Appeal for the Eleventh Circuit has suggested that rain water runoff from a point source falls within the prohibited pollutant discharges under the CWA and requires a NPDES permit. Driscoll v. Adams, 181 F.3d 1285, 1290 (11th Cir. 1999). While Plaintiffs are correct that Driscoll does not directly address the possible differences in the applicability of the CWA's two permit schemes under § 402 and § 404, it is still informative.

Plaintiffs also argue that: "The Clean Water Act requires a permit under the National Pollutant Discharge Elimination System (NPDES) for storm water discharges associated with construction and industrial activities including clearing, grading and excavation of at least one acre." (Resp. Mot. to Dismiss at 15.) The Affidavit of Plaintiffs' expert states the same. (Aff. of Dr. Brian Wellington (Docket Entry No. 17-2) ¶ 4.) CWA § 402 provides the EPA the authority to "issue a

permit for the discharge of any pollutant, or combination of pollutants" "[e]xcept as provided in sections 1328 and 1344."

33 U.S.C. § 1342(a)(1).  The Supreme Court explained:

> Section 402 gives the EPA authority to issue "permit[s] for the discharge of any pollutant," with one important exception: The EPA may not issue permits for fill material that fall under the Corps' § 404 permitting authority....Section 402 thus prohibits the EPA from exercising permitting authority that is "provided [to the Corps] in" § 404.

Coeur Alaska, 557 U.S. at 273 (alterations in original).

The Court concludes that § 404 is inapplicable to the facts presented in this case.  Most significantly, Defendants Forestar and Temco are not engaged in either dredging or filling the Little Pumpkinvine Creek.   Their construction-related activities have the purpose of constructing residential homes on undeveloped property, not changing the use of the waterway.   33 C.F.R. § 323.2(f) also provides a list of activities that constitute "discharge of fill material."  The Court

21

cannot easily analogize the actions of Defendants Forestar and Temco to any activity on that list.   Based on the plain language of the statute and the implementing regulations, the Court finds that CWA § 404 does not cover the activities of Defendants Forestar and Temco.

Additionally, the sediment that Plaintiffs allege is flowing from the under-construction lots over the cul-de-sac, through Plaintiffs' property, and into the Creek is not dredge or fill material under the applicable regulations.   Clearly, such sediment was not dredged from the Creek.   There are also no facts that would suggest that the sediment is either replacing any portion of the water with dry land or changing the bottom elevation of the Little Pumpkinvine Creek.   There are no allegations suggesting that the sediment does anything other than flow downstream.   Plaintiffs' vague and conclusory allegations do not suggest otherwise.   (Compl. ¶

22

67.)   In <u>Starlink Logistics, Inc. v. ACC, LLC</u>, No. 1:12-CV-0011, 2013 WL 2177908 (M.D. Tenn. May 20, 2013), another United States District Court, concluded that the palintiff's allegation "that the ongoing discharge of sediment-laden stormwater has, over time, substantially raised the bottom elevation of the upper portion of" a lake was insufficient because the agency regulations made it clear that this type of discharge did not constitute fill material.   2013 WL 2177908 at *6.   <u>Starlink</u> applied the same agency regulations and interpretations relevant here and noted that the courts give substantial deference to an agency interpretation that is not plainly erroneous.   <u>Id.</u>   The Court finds the reasoning in <u>Starlink</u> persuasive, and applies it here.   The Court thus concludes that the sediment-laden

23

stormwater discharges in this case do not constitute fill material.[3]

Finally, the Parties, and Plaintiffs' expert, agree that CWA § 402 is relevant to this case. The Supreme Court, however, has found that the EPA and Corps' permit-granting authority is not entirely concurrent. Instead, where the Corps has authority to issue a permit for a given activity, the EPA

---

[3] Another court in this District allowed a case "alleging that the defendants caused silt and sediment-laden water to be discharged into the two lakes and the surrounding wetlands" in violation of CWA §§ 301, 402, and 404 to proceed past summary judgment. City of Mountain Park, GA v. Lakeside at Ansley, LLC, 560 F. Supp. 2d 1288, 1289-90 (N.D. Ga. Apr. 15, 2008). That court, however, did not address the scope of § 404 permits or the meaning of fill material. See generally id. In fact, it does not even appear that the parties in that case raised the issue. The Court therefore does not find that case persuasive. Another case cited by Plaintiffs, Jones Creek Inv'rs, LLC v. Columbia Cty., Ga., No. CV 111-174, 2013 WL 1338238 (S.D. Ga. Mar. 28, 2013), relies on Mountain Park and does not address the issues raised by Defendants Forestar and Temco. Additionally, Jones Creek is distinguishable because there were factual allegations that the rainwater, sediment, and rock were settling into, filling up, and staying in the lake at issue. 2013 WL 1338238 at *3-4.

does not, and vice-versa. Plaintiffs argue that: "Although Defendants are correct that § 404 permittees may be exempted from the NPDES permit system, this does not mean that the reverse is also true. There is no legal authority to support the contention that a § 402 permittee is exempt from the requirements under § 404." (Resp. Mot. to Dismiss at 17.) With all due respect, Plaintiffs' logic here is flawed. If a § 402 permittee also had to obtain a § 404 permit for the same activity, then the Corps would have authority to issue that § 404 permit. The Supreme Court has made it clear that if the Corps has authority to issue a § 404 permit, then the EPA does not have authority to issue a § 402 permit at the same time for the same activity. It is thus quite true, and supported by the highest legal authority, that § 402 permittees do not also need § 404 permits for the same activity. It is possible that the same permittee may

need both permits.  (See Surreply Mot. to Dismiss (Docket Entry No. 23) at 3-5.)  The issue in this case, however, is moot because Plaintiffs have failed to establish that discharges caused by Defendants Temco and Forestar are "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject" or are filling in the Little Pumpkinvine Creek.

Based on the foregoing reasons, the Court concludes that Defendants Forestar and Temco were not required to obtain a permit under CWA § 404.[4]  The Court therefore dismisses Count II of Plaintiffs' Complaint.

---

[4]  Furthermore, based on this conclusion, the Court need not determine whether § 404 provides a private right of action to enforce the section.  (See Br. Supp. Mot. to Dismiss at 10-15.)

26

## B.   Current or Past Violations

Defendants Forestar and Temco argue that Plaintiffs have only plead past violations of the CWA and the evidence shows there are only past violations of the CWA, which deprives the Court of subject matter jurisdiction.  (Br. Supp. Mot. to Dismiss at 16-24.)  Defendants Forestar and Temco thus make both a facial challenge and a factual challenge to Plaintiffs' claims.   The Court evaluates each of those challenges separately.

CWA § 505 "states that in the absence of federal or state enforcement, private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of their NPDES permit." Atl. States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1133 (11th Cir. 1990).   Thus, "a plaintiff proceeding under § 1365 must prove that the defendant was violating the Act at the time the

27

suit was initiated." State of Ga. v. City of E. Ridge, Tenn., 949 F. Supp. 1571, 1579 (N.D. Ga. Nov. 20, 1996) (citing Gwaltney v. Chesapeake Bay Foundation, 484 U.S. 49, 64– 65 (1987)). "In other words, the plaintiff must show that, when the suit was filed, there existed 'a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future.'" City of E. Ridge, Tenn., 949 F. Supp. at 1579 (quoting Gwaltney, 484 U.S. at 57).

### 1. Facial Challenge

"[A] good faith allegation of violations that continued at the time suit was filed is sufficient for jurisdictional purposes." Atl. States Legal Found., 897 F.2d at 1133. For a facial challenge, plaintiffs receive protections similar to those when responding to a motion to dismiss for failure to state a claim. AFC Enters., 2010 WL 4537812, at *2. When reviewing a

motion to dismiss, the Court must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff.  Alvarez v. Attorney Gen. for Fla., 679 F.3d 1257, 1261 (11th Cir. 2012).

In this case, Plaintiffs have easily met their initial burden for establishing continuing violations of CWA.  Plaintiffs have alleged a detailed series of events when sediment-laden rainwater streamed onto their property from the lots under construction all the way up to December 2, 2015, approximately two weeks before they filed their Complaint. §505(a) "does permit such suits when there is a pattern of intermittent violations, even if there is no violation at the moment suit is filed."  Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 171 (4th Cir. 1988) ("Gwaltney II").  Plaintiffs also alleged that these discharges continue to happen and that Defendants Forestar

29

and Temco continue to allow this to happen in violation of the terms of their permits. Plaintiffs claim that the discharges violate a number of Georgia water quality standards that the General Permit requires compliance with. Plaintiffs also identify a number of other requirements of the General Permit and allege that Defendants continue to violate those terms. Taking the allegations of the Complaint in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have sufficiently alleged the existence of ongoing violations of the CWA and Defendants' permits.

### 2. Factual Challenge

Plaintifffs may prove an ongoing violation on the merits by "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing

likelihood of a recurrence in intermittent or sporadic violations." Gwaltney II, 844 F.2d at 171-72.[5]

Defendants Forestar and Temco argue that the videos and photographs attached as Exhibits E and J to the Complaint demonstrate that the allegations as to the November 18, 2015 and December 1-2, 2015 events do not amount to CWA violations. (Br. Supp. Mot. to Dismiss at 19.)[6] According to Defendants Forestar and Temco, the video from December 2, 2015 "shows only nonpoint source

---

[5]   The Court notes that Gwaltney II addressed whether the plaintiffs had proved an ongoing violation at trial. 844 F.2d at 171. This is a motion to dismiss and no discovery or fact finding has occurred.

[6]   Defendants Forestar and Temco contend that the events prior to those occurred before the receipt of Plaintiffs' Notice of Intent to Sue on September 18, 2015 and thus are irrelevant because "Defendants had no notice of any concerns that there may have been, nor an opportunity to correct them." (Br. Supp. Mot. to Dismiss at 19.) The Court need not address this argument at this juncture if the remaining allegations sufficiently establish jurisdiction, which is the only issue the Court is presently tasked with addressing.

water flow, like the natural sheeting of water down the street," which is not a violation of the CWA. (Id.) Defendants Forestar and Temco also state that the video shows the BMPs, including silt fencing, filter bags, straw top cover, and straw wattle, functioning properly as well as a newly installed drainage gate in front of Plaintiffs' garage. (Id. at 20.) Defendants' expert, Dr. Wade L. Nutter, opines that these BMPs "were in place and functional" on December 1 and 2, 2015. (Mot. to Dismiss Ex. A (Docket Entry No. 16-2) at 3.) Dr. Nutter further opined:

> It is my professional opinion that the BMPs I observed were appropriate and adequate for controlling stormwater from the construction sites and were updated as construction activities and soil disturbance changed. The silt fence and other on-site BMPs, including the straw wattles at the two curb inlets and the sediment basin at the end of the discharge pipe were effective in collecting and controlling sediment. Further, there was no evidence that Little Pumpkinvine Creek had

32

sediment deposits or any adverse impacts from the construction sites along Little Pumpkinvine Creek.

(Id. at 4.)

Defendants Forestar and Temco further argue that the video from December 1, 2015 does not show any CWA violations and instead shows only functioning BMPs. (Br. Supp. Mot. to Dismiss at 21-22.) Dr. Nutter indicated that "[a]ll BMPs were in place and functional" on December 1, 2015. (Mot. to Dismiss Ex. A at 3.) Defendants contend that the November 18, 2015 video does not show any CWA violations and, instead, shows no point source discharges and functioning BMPs. (Br. Supp. Mot. to Dismiss at 22.) Some of the additional BMPs were put in place after November 18, 2015. (Id.) Dr. Nutter indicates that on November 18 there was "a fairly extreme" rain event, and "from the photographs [he] observed the BMPs were

33

functioning but overwhelmed in a few places by the high intensity event." (Mot. to Dismiss Ex. A at 4.)

In response, Plaintiffs submit the Affidavit of Plaintiff Wendy Coward as well as the Affidavit of Dr. Brian Wellington, their own expert, to demonstrate that discharges of sediment-laden storm water and mud onto Plaintiffs' property and into the Little Pumpkinvine Creek have continued after the filing of the Complaint. (Resp. Mot. to Dismiss at 23.) Plaintiff Wendy Coward states that on December 24, 2015 mud and storm water flowed from Lots 8, 9, 10, and 11, across the cul-de-sac, onto her property, and into the Creek. (Aff. of Pl. Wendy Coward (Docket Entry No. 17-1) ¶ 18.) According to Plaintiff Wendy Coward, on December 25, 2015, the same discharges occurred, and she found muddy water seeping under the silt fencing on Lot 9 and the retention pond was full of silt. (Id. ¶ 19.)

Plaintiffs' expert, Dr. Wellington, reviewed the site development plans and visited Plaintiffs' property on February 24, 2016.  (Aff. of Dr. Brian Wellington (Docket Entry No. 17-2) ¶ 3.)  Dr. Wellington states that he observed "a buildup of sediment within the sediment trap at the culvert outlet" into Little Pumpkinvine Creek, and he opines that "it is more likely than not that during rain events sediments captured within this area will overtop the sediment trap and will be discharged into the Creek."  (Id. ¶ 7.)  Dr. Wellington also claims that two of the curb inlets installed on Lullwater Late are ineffective for capturing storm water due to the steepness of the road and "thus a significant amount of storm water is directed towards [Plaintiffs'] property."  (Id. ¶ 8.)  Dr. Wellington continues, stating that the third curb inlet, located adjacent to Plaintiffs' property, should capture storm water flowing down hill but "instead of flowing towards the

curb inlet, storm water is discharged onto [Plaintiffs']
driveway and directed to their home." (Id.) According to Dr.
Wellington, the two grated drop inlets installed on both ends
of Plaintiffs' driveway "have been ineffective in preventing the
flooding of [Plaintiffs'] home." (Id. ¶ 9.)

Based on his site visit and observation of stained grass
and water, Dr. Wellington concluded that the erosion control
measures on Lot 8 "are allowing sediments to escape the
site." (Dr. Wellington Aff. ¶ 11.) Dr. Wellington states that the
BMPs "were not properly maintained" when he visited the
site. (Id.) Dr. Wellington claims that the temporary sediment
ponds "failed to adhere to the required design standards,"
resulting "in significant sediments escaping the site and
being deposited in Little Pumpkinvine Creek and adjacent
wetlands." (Id. ¶ 13.)

Plaintiffs contend that the evidence supplied by the Affidavits of Plaintiff Wendy Coward and Dr. Wellington are sufficient to establish jurisdiction under the second prong of the Gwaltney II test. (Resp. Mot. to Dismiss at 24.) Defendants Forestar and Temco contend that Plaintiffs' evidence is insufficient. (Reply Mot. to Dismiss (Docket Entry No. 21) at 6-7.) Defendants Forestar and Temco ask the Court to favor their expert because he visited the site more often and on days when it rained. (Id. at 7.) They also contend that the videos show only sheet flow and do not show that the BMPs failed or that there were point source discharges. (Id.)

In essence, Defendants Forestar and Temco are asking the Court to decide the merits of Plaintiffs' Complaint--whether Defendants are violating the CWA--under the guise of a motion to dismiss for lack of subject matter jurisdiction.

37

"When the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction." Lawrence, 919 F.2d at 1530.  Accordingly, "the full panoply of protections afforded the party opposing such a motion will apply here."  Id.[7]  Applying this standard, a district should dismiss a plaintiff's claim "[w]here the plaintiff's claims are 'clearly immaterial, made solely for the purpose of obtaining jurisdiction or are wholly unsubstantiated and frivolous.'"  Id. at 1530 n. 7 (quoting Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 734 (11th Cir. 1982)).  The Court therefore applies

---

[7]  In other circuits, courts "make a threshold finding under Rule 12(b)(1), which may entail limited discovery and jurisdictional fact-finding, before ruling on the merits," but the Eleventh Circuit does not follow that approach, instead applying the Rule 56 standard.  Douglas v. United States, --- F.3d ---, ---, No. 14-11444, 2016 WL 791232, at *8 (11th Cir. Feb. 29, 2016).

the summary judgment standard to Defendants Forestar and Temco's factual challenge to subject matter jurisdiction in this case.

Federal Rule of Civil Procedure 56(a) allows a court to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate and may satisfy this burden by pointing to materials in the record. Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012). Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial. Id.

39

When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion.  Morton v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013); Strickland, 692 F.3d at 1154.  The Court also must "resolve all reasonable doubts about the facts in favor of the non-movant." Morton, 707 F.3d at 1280 (internal quotation marks and citations omitted).  Further, the Court may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, or assess the quality of the evidence presented.  Strickland, 692 F.3d at 1154.  Finally, the Court does not make factual determinations. Rich, 716 F.3d at 530.

Applying this standard, the Court concludes that it has subject matter jurisdiction over Plaintiffs' CWA claims at this time.   There exists a genuine dispute of material fact

between Plaintiffs and Defendant Forestar and Temco.  The Court at this juncture cannot weigh conflicting evidence or make credibility determinations, including resolving the battle of the experts that will likely continue to develop in this case. The expert reports alone indicate that reasonable jurors may be able to conclude that Defendants Forestar and Temco violated the CWA.  The Court thus denies this portion of Defendant Forestar and Temco's Motion to Dismiss.

### C.   Supplemental Jurisdiction

Because some of Plaintiffs' federal law claims survive this Motion to Dismiss, the Court, in its discretion, continues to exercise its supplemental jurisdiction over Plaintiffs' state law claims.  28 U.S.C. § 1367.

### IV.  Conclusion

ACCORDINGLY, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants Forestar and Temco's Motion

41

to Dismiss [16].    The Court **GRANTS** the Motion and **DISMISSES** Count II of Plaintiffs' Complaint.    The Court otherwise **DENIES** the Motion.

IT IS SO ORDERED, this the 7 day of April, 2016.

_____
UNITED STATES DISTRICT JUDGE

42